UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**Phillip M. Baugus,** Administrator of the
Estate of Michael P. Coburn, Deceased

        **Plaintiff,**

      **v.**

**Brandon Newsome, et al.,**

        **Defendants.**

**Case No. 2:20-cv-04900**
**Judge Edmund A. Sargus, Jr.**
**Magistrate Judge Elizabeth Preston Deavers**

**<u>OPINION AND ORDER</u>**

This matter is before the Court on Defendants Burgess Castle, Warren Davis, Steven Fox, John L. Hinton, Brandon Newsome, and Thomas E Whiston's Motion for Summary Judgment. (ECF No. 51). For the reasons stated herein, the Court **GRANTS** Defendants' Motion for Summary Judgment.

**A. Procedural Background**

Plaintiff Philip M. Baugus, Administrator of the Estate of Michael P. Coburn, brought a complaint against the above-mentioned Defendants, amongst others, on September 18, 2020. Defendants (ECF No. 1). All Defendants filed their Answer on November 20, 2020. (ECF No. 16). On April 19, 2022, Plaintiff filed his First Motion for Order to Partially Voluntarily Dismiss Without Prejudice against Defendants Thomas E. Whiston, Burgess Castle, Warren Davis, and Steven Fox. (ECF No. 29). This motion was later terminated on May 10, 2022. However, on May 6 of the same year, Plaintiff filed his Second Motion to Voluntarily Dismiss Voluntarily – Partially and Without Prejudice against Thomas E. Whiston, Burgess Castle, and Warren Davis. (ECF No. 33). Defendants timely submitted their Response on May 18. (ECF No. 34). One

week later, on May 25, Plaintiff Replied (ECF No. 36). Due to non-compliance with Local Rule 5.1 (c) Plaintiff was required to re-submit his Reply, which he did on August 10, 2022. (ECF No. 39).

Defendants Burgess Castle, Warren Davis, Steven Fox, John L. Hinton, Brandon Newsome, Thomas E Whiston filed a Motion for Summary Judgment on September 15, 2022. (ECF NO. 51). Exactly a week later, the parties Stipulated to the dismissal of Defendants Thomas E. Whiston, Burgess Castle, and Warren Davis. (ECF 60). The Court granted this order on September 26, leaving only John L. Hinton, Brandon Newsome, Thomas E Whiston as Defendants. (ECF No. 61). Plaintiff filed his Response to Defendants Motion for Summary Judgment the next month, on October 6, 2022. (ECF No. 64). The remaining Defendants Replied four days later, on October 10. (ECF No. 66).

On October 31 Plaintiff, finding apparent good cause in Defendants Reply, moved to file a Sur-Reply. (ECF No. 68). This was opposed by Defendants, who Responded the next day. (ECF No. 69). Plaintiff Replied shortly after, on November 7, 2022. (ECF No. 70).

## B. Factual Background

In 2018 decedent Michael Coburn was a 27-year-old man living in Morrow County. He resided part time in the home of his grandfather, Phillip Baugus. (ECF No. 46, Page 11,12). Also living in the residence were his mother, Lorrie Robinson, his brother Nicholas Coburn, and his sister, Lindsey Robinson. (*Id.*, Page 12). On November 28, 2018, at around 6 P.M., Michael and Lorrie entered into an argument at their shared residence. (ECF No. 46, Page 28, 29). Lorrie states the dispute began because "he showed up here high in a very bad state of mind" due to what Lorrie suspected to be "drug use." (*Id.*, 28). During their dispute, Lorrie heard Michael

2

make threats of suicide.  "He was telling me that he was planning to kill himself and told me his plan was he was going to overdose on heroin."  (*Id.*, Page 29).  After an indeterminate period of argument, Michael attempted to contact someone, it is unclear who, to take him away from the home.  (*Id.*, 29, 37).  Lorrie then called 911.  (*Id.*, Page 35).  Lorrie stated the reason for this 911 call was "Michael's suicidal statements."  (*Id.*).  The incident report confirms she told the 911 operator her son was going to kill himself by overdose.  (ECF No. 43, Exhibit G).

After "at least" 10 minutes, Deputy Newsome arrived at Lorrie and Michael's address. (ECF No. 46, Page 36).  It appears that during these intervening minutes an individual arrived at the residence and attempted to take Michael away from the home.  (*Id.*, Page 37) (ECF No. 43, Exhibit G, Page 3).  However, after being informed of the approaching deputy, this person left without Michael.  (ECF No. 46, Page 37) (ECF No. 43, Exhibit G, Page 3).  Following their departure, Michael attempted to quit the residence by foot, but eventually turned back.  (ECF No. 46, Page 37).  Shortly after his return, Lorrie met Dpt. Newsome outside.

Lorrie informed Dpt, Newsome that Michael was "threatening suicide," that he had told her how he was to accomplish this, and that Lorrie "wanted him to be transported to a medical facility."  (ECF No. 46, Pages 38, 39).  After a few minutes, Michael joined Lorrie and Dpt. Newsome outside.  (*Id.*, 38).  Lorrie and Michael soon started quarreling again, creating a "very chaotic situation."  (ECF No. 46, Page 41).  However, Michael was cooperative with the Deputy, even going so far as to allow Dpt. Newsome to flick "his flashlight into his eyes to see if he appeared intoxicated."  (*Id.*, 39).  Dpt. Newsome found that Michael's "pupils were normal size and reacted to my flashlight every time." (ECF No. 43, Exhibit G, Page 4).  Lorrie, a nurse, disputes this conclusion.  She states that Michael's pupils were dilated that evening, and that Michael was visibly high.  (ECF No. 46, Page 34).

After Dpt. Newsome checked Michael's pupils, he engaged Michael in conversation. According to both Lorrie and Dpt. Newsome, Michael actively responded to the deputy's questions.  (ECF No. 46, Page 41) (ECF No. 43, Page 52).  Throughout the conversation, and every interaction with officers that night, Michael repeatedly denied he had any desire to harm himself.  (ECF No. 46, Page 40, 41) (ECF No. 43, Page 52).  He also repeatedly denied being on drugs (ECF No. 46, Page 40).  The Deputy's incident report states that he offered to take Michael "to a place which could help him," but Michael refused.  (ECF No. 43, Exhibit G, Page 4).  Lorrie disputes that Deputy Newsome actually made this offer but admits Michael said he "didn't need to go to a hospital."  (ECF No. 46, Page 51).  At some point Dpt. Newsome asked Lorrie for any written indication that Michael had threatened suicide, but she was unwilling or unable to provide any.  (*Id.*, Page 50).

Michael, a diabetic, told Dpt. Newsome in no uncertain terms that he had no desire to kill himself, and that the only thing that would kill him was a lack of insulin.  (ECF No. 43, Exhibit G, Page 4) (ECF No. 46, Page 51).  Michael told the deputy that he could acquire insulin from a friend he referred to as "Mike."  (ECF No. 43, Exhibit G, Page 4).  Deputy Newsome's incident report referred to Mike as a "family friend" (*Id.*) but Lorrie believed that Michael was getting insulin "from the streets."  (ECF No. 26).  His sister, on the other hand, thought Michael got his insulin from a pharmacy.  (ECF No. 48, Page 30).  There is no indication in the record that Deputy Newsome was informed about the supposedly questionable nature of this insulin, although he did know it was coming from "Mike."  (ECF No. 43, Exhibit G, Page 4).  Later that night, right before the deputy drove Michael away from residence, Michael asked his mother to pick up insulin from Mike and deliver it to his ultimate destination.  (ECF No. 43, Exhibit G, Page 5) (ECF No. 46, Page 53, 54).  Lorrie acquiesced.  (ECF No. 43, Exhibit G, Page 5) (ECF

4

No. 46, Page 54).  The Deputy was aware of this agreement.  (ECF No. 43, Exhibit G, Page 5).

Michael, Lorrie, and Dpt. Newsome stayed outside for a number of minutes but eventually made their way into the home.  (ECF No. 46, Page 41,42).  There, Dpt. Newsome spoke with Michael's siblings, Lindsey and Nicholas.  (ECF No. 46, Page 52).  Both denied that Michael had made any suicidal statements that night.  (*Id.*) (ECF No. 63, Page 16).   Both expressed frustration at Michael's presence in the home.  (ECF No. 43, Exhibit G, Page 4).  The mood at the home was tense and chaotic. (ECF No. 46, Pages 41, 53) (ECF No. 43, Exhibit G, Page 4).

Sgt. Fox eventually arrived at the residence to assist Dpt. Newsome. He took Michael outside, away from his family, "to diffuse the situation" as "things had gotten a bit loud."  (ECF No. 46, Page 53) (ECF No. 43, Page 6).  Sgt. Fox also questioned Michael, inquiring if he had any desire to harm himself.  (ECF No. 43, Exhibit G, Page 6).  Michael stated that "he was going to see his daughter today and he didn't want to do anything like that."  (*Id.*).  Sgt. Fox asked Michael if he would like to go to a hospital, but Michael refused.  (*Id.*).  Michael told Sgt. Fox he planned to stay at the home of his friend, Korey Levings, that night.  (*Id.*).  Dpt. Newsome asked Sgt. Fox if he could give Michael a ride to Mr. Levings residence, and Sgt. Fox signaled his assent.  (ECF No. 43, Exhibit G, Page 5).  Shortly thereafter, Sgt. Fox asked Dpt. Newsome if his presence was needed.  (*Id.*).  Dpt. Newsome stated that it was not, and Sgt. Fox left the scene.  (*Id.*).

The eyewitnesses to this incident disagree on Michael's level of intoxication.  Dpt. Newsome apparently believed he was not intoxicated.  (ECF No. 43, Exhibit G, Pages 4).  He even went so far as to wave off an Emergency Medical Squad that was waiting on standby.  (*Id.*)

(ECF No. 43, Page 50). Sgt. Fox's incident report made no mention of Michael's supposed intoxication, nor any abnormal behavior. Michael's sister was unsure if Michael was on drugs. When asked if he appeared to be intoxicated, she answered "Yes. But I also couldn't tell for sure if he was high or if it, was the lack of sleep from the drug use the days prior." (ECF No. 48, Page 17). Michael's mother, on the other hand, was convinced he was on drugs. (ECF No. 46, Pages 28, 35-36). Michael's brother was similarly confident in that conclusion. (ECF No. 63, Page 12). However, it is not disputed that Michael was able to calmly converse with the officers and that he was cooperative. (ECF No. 46, Page 39). And not one witness, not even Lorrie, saw Michael take any drugs that night. (*Id.*, Page 33). Further, Lorrie stated in deposition that Michael would "try to hide" his intoxication "from others such as law enforcement, EMS." (ECF No. 47, Page 6).

After Sgt. Fox left, Dpt. Newsome informed Lorrie "where [he] was taking Michael'" (ECF No. 43, Exhibit G, Page 5). Witnesses dispute how the family reacted to Michael's decision to leave with Dpt. Newsome. The deputy's incident report states that Lorrie "did not want him here anymore" and that Lindsey stated, "why don't you just stay away from here, we don't want you here." (ECF No. 43, Exhibit G, Page 5). Lindsey herself, on the other hand, remembers her mother and herself "pleading with Michael to just stay at the house." (ECF No. 48, Page 29). However, it is uncontested that Michael did choose to leave with Dpt. Newsome. (ECF No. 63, Page 18).

Before taking Michael to Korey's home, Dpt. Newsome ran a warrant check on Mr. Levings. (ECF No. 43, Exhibit G, Page 4). This check showed no active warrants. (*Id.*). Additionally, Dpt. Newsome patted Michael down and once again flicked a flashlight into his eyes before letting him into the cruiser. (*Id.*. Page 5). Dpt. Newsome's search came back

negative for drugs, turning up only cigarettes and a blood sugar reader. (*Id.*). The deputy then proceeded to drive to Korey's home and drop Michael off at around 7:20 P.M. (*Id.*) (ECF No. 43, Page 83). He then left before Michael entered the residence. (ECF No. 43, Exhibit G, Page 5) (ECF No. 43, Page 83). Michael, finding Korey to be away, walked to the home of his friend Kasey. (ECF No. 46, Page 63) (ECF No. 45, Page 10). The two soon went to a local pizza parlor, arriving right before 8:30 PM. (ECF No. 45, Page 11) (ECF No. 50).

After dinner, the two made their way back to Korey Levings residence, where they proceeded to smoke methamphetamine until around 10PM, at which time Kasey left to go back home. (ECF No. 45, Pages 17-19). Michael followed roughly 25 to 30 minutes later. (*Id.*). Sometime after 1 A.M. Kasey fell asleep. (*Id.*, 18). Michael, however, stayed awake. At no point in the night did Lorrie deliver Michael his insulin. (ECF No. 46, Page 60).

During the early morning hours, Michael made his way on foot from Kasey's residence to West Main Street, a part of U.S. Route 42. (ECF No. 43, Page 85). Michael walked onto the highway, stretched out on the road, and was struck by a vehicle around 3:45 A.M. (ECF No. 50). While the parties dispute whether Michael chose to lie in the road, or if did so as a result of his intoxication and high blood sugar, there is no debate on what happened next. While lying on the highway, Michael was struck by a moving vehicle. (*Id.*). He later died as a result of his injuries.

## C. Standard

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence

of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence). Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587–88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment). It is with this standard in mind that the instant motion will be decided.

The moving party bears the burden of production first. "The moving party bears the burden of showing the absence of a genuine issue of material fact as to at least one essential element on each of Plaintiff's claims. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The non-moving party then must present sufficient evidence from which a jury could reasonably

find for her. *See Anderson Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986).  The court must determine "whether the evidence present sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251–52.

The summary judgment analysis is complicated when the Defendant claims qualified immunity.

"Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982). 'Thus, a defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established.' *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011) (citing *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009)); see also *Moderwell v. Cuyahoga County*, 997 F.3d 653, 659-660 (6th Cir. 2021). "Once raised, the plaintiff bears the burden of showing that a defendant is not entitled to qualified immunity." *Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011) (citing *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006)). That is, although on summary judgment this Court views the factual evidence and draws all reasonable inferences in favor of the non-moving party, when a defendant raises the defense of qualified immunity in a motion for summary judgment, the plaintiff must show that those facts and inferences would allow a reasonable juror to conclude that the defendant violated a clearly established constitutional right. See *Barton v. Martin*, 949 F.3d 938, 947 (6th Cir. 2020)."

*Williams v. Maurer*, 9 F.4th 416 (6th Cir. 2021).

## D. Analysis

Defendants argue that they are entitled to summary judgment on all of Plaintiff's remaining claims.  These claims are "[v]iolations of 42 U.S.C. §1983" by Dep. Newsome and Sgt. Fox (ECF No. 64, Page 3), "[v]iolations of 42 U.S.C. §1983" by Morrow County Commissioners and the Morrow County Sheriff (a Monell claim) (*Id*., Page 4), and a state law wrongful death claim under "Ohio Rev. Code §2125.01, et seq" against Dep. Newsome and Sgt. Fox (*Id*.).  Defendants also question Plaintiff's use of expert reports in his Response.  (ECF No. 66, Pages 10- 12).

### a. Expert Report

Defendants have challenged Plaintiff's use of certain opinions elicited from Dr. Wainer in his deposition. (ECF No. 66, Page 12). These opinions are quoted in both Plaintiff's Response and his Sur-Reply. Defendants argue that the opinions are inadmissible at trial and, as such, should not be considered at summary judgment. (ECF No. 66, Pages 10-11). The Dr. Wainer opinions in question involve testing "pupil dilation" through the "use of a flashlight, or whether Michael's behavior was consistent with meth intoxication or hyperglycemia." (ECF No. 68, Exhibit 4, Page 10). These arguments were not expressed in Dr. Wainer's Coroner's Report. (ECF No. 41, Exhibit 2). For the sake of argument, the Court will consider Plaintiff's Sur-reply. However, the Court will not consider those of Dr. Wainer's opinions that were not expressed in his expert report. Fed. R. Civ. P. 26(a)(2)(B) is quite explicit about the need for experts to provide a written report containing "a complete statement of all opinions the witness will express and the basis and reasons for them."

Plaintiff's cites only to *Johnson v. Williams* in order to argue that the court should consider expert opinions from Dr. Wainer that were not expressed in his report. There, the district court found that "[i]f a doctor does not explicitly speak on an issue in his Rule 26(a)(2)(B) report, it 'is not fatal to his ability to testify as to that issue as an expert witness.'" (ECF No. 70, Page 7) citing *Johnson v. Williams*, Civil Action No. 15-13856, (E.D. Mich. Aug. 7, 2017). This citation is misplaced.

In *Johnson*, the court held that Plaintiff's expert committed a "technical violation of Rule 26(a)(2)(i)'s requirement that his report contain a 'statement of all opinions the witness will express'" by not explicitly stating a certain opinion in his report. *Id*, 22. Even still, the court

allowed the expert to state the opinion in question. *Id*. The opinion Johnson's expert expressed was one of causation. While the expert's report did not contain an explicit opinion on causation, it did contain statements about causation. They came from "information Rasmussen learned from others, not his own opinions." *Id.*, 20. Additionally, "Rasmussen clarified early on at deposition that it was his opinion" there was causation. *Id*., 22. Furthermore, the court placed emphasis on Rasmussen's inexperience as an expert and the harmlessness of this error. *Id.*, 21-22. *Johnson* is distinguishable from the case at hand. Here, Dr. Wainer's expert report is a Coroner's Report, while the opinions Plaintiff seeks to rely upon involve police procedures and Michael's behavior before death. Plaintiff has provided no facts upon which this Court could conclude that Dr. Wainer is an inexperienced witness and has made no arguments as to the harmlessness of this error. As such, the Court will discount these opinions. The Court will disregard all of Dr. Wainer's deposition opinions that have not been expressed in his expert report.

### b. Qualified Immunity

The 6th Circuit has held that qualified immunity "is a threshold question to be resolved at the earliest possible point," *Vakilian v. Shaw*, 335 F.3d 509, 516 (6th Cir. 2003) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 817, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). The circuit stated "[t]hat point is usually summary judgment." *Wesley v. Campbell*, 779 F.3d 421 (6th Cir. 2015). As such, the Court will start with this issue. As detailed below, the Court finds that Defendants Dep. Newsome and Sgt. Fox are entitled to qualified immunity and that summary judgment should therefore be **GRANTED**.

Defendants contend "Deputy Newsome and Sgt. Fox should be granted summary

judgment because they did not violate Michael's clearly established Fourteenth Amendment rights" and, therefore, are entitled to qualified immunity. (ECF No. 51, Page 16). Plaintiff maintains "Dep. Newsome and Sgt. Fox cannot invoke qualified immunity" as "[q]ualified immunity does not protect 'the plainly incompetent or those who knowingly violate the law.'" (ECF No. 64, Page 36) quoting *Chappell v. City of Cleveland*, 585 F.3d 901, 907 (6th Cir. 2009).

There is no dispute between the parties that Dpt. Newsome and Sgt. Fox were engaged in discretionary functions during their interaction with Mr. Coburn. Plaintiff must prove that "(1) the defendant violated a constitutional right; and" whether "(2) the right was clearly established." *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011). The 6th Circuit has declared that "When a qualified immunity defense is asserted at the pleading stage, we have historically found that the inquiry should be limited to the "clearly established" prong of the analysis if feasible." *Clark v. Stone*, 998 F.3d 287, 298 (6th Cir. 2021); *See Barber v. Miller*, 809 F.3d 840 (6th Cir. 2015); *Lyons v. City of Xenia*, 417 F.3d 565, 582 (6th Cir. 2005). We can begin and end our analysis on the second prong.

"A right is 'clearly established' if '[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Baynes v. Cleland*, 799 F.3d 600, 610 (6th Cir. 2015) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)). The "Supreme Court has made clear that the sine qua non of the 'clearly established' inquiry is 'fair warning.'" *Baynes v. Cleland*, 799 F.3d 600, 612-13 (6th Cir. 2015) quoting *Hope v. Pelzer*, 536 U.S. 730, 741 122 S. Ct. 2508 (2002). Thus, a plaintiff is required to show that the "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 131 S. Ct. 2074 (2011). Plaintiff can make this showing in one of two ways. They may "identify a case that put

[the officers] on notice that [their] specific conduct was unlawful." *Colson v. City of Alcoa*, 37 F.4th 1182, 1189 (6th Cir. 2022) quoting *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4, 8 (2021). Or the plaintiff may argue that this is an "'obvious case' where general 'standards can 'clearly establish' the answer, even without a body of relevant case law.'" *Id*. quoting *Rivas-Villegas*, 142 S. Ct. at 8. Either way, a "plaintiff must, at a minimum, offer sufficient evidence to create a 'genuine issue of fact'; that is, 'evidence on which [a] jury could reasonably find for the plaintiff.'" *Bunkley v. City of Detroit*, 902 F.3d 552, 559 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

Plaintiff does not cite to any cases from the Supreme Court, the 6th Circuit, courts within the 6th Circuit, any other Circuit, or any court whatsoever that are directly on point. This, by itself, is likely dispositive. "[T]he burden is on the plaintiff to show that closely analogous precedent has placed the 'constitutional question beyond debate.'" *Trozzi v. Lake Cty*., 29 F.4th 745 (6th Cir. 2022) citing *Cunningham v. Shelby County*, 994 F.3d 761, 764 (6th Cir. 2021) (quoting *White v. Pauly*, 580 U.S. 73, 137 S. Ct. 548, 551, 196 L. Ed. 2d 463 (2017) (per curiam)). ("[A] body of relevant case law is usually necessary to clearly establish the answer." *City of Escondido v. Emmons*, 139 S. Ct. 500 (2019).

Plaintiff does argue that "[t]he risk of harm to Michael was so obvious that Dep. Newsome and Sgt. Fox should have known about it." (ECF No. 64, Page 37). He states that "Dep. Newsome and Sgt. Fox violated Michael's due process rights by increasing his vulnerability to danger and by placing him in harm's way." (*Id.*).

Plaintiff's expert, Mr. Noble opines that Dpt. Newsome and Sgt. Fox's actions deviated from the standards a reasonable officer would have adhered to and increased Michael's

vulnerability to danger[1].  First, Mr. Noble decries the officers' failure to summon Emergency Medical Services to evaluate Mr. Coburn.  ("Here any reasonable police officer would have requested EMS to evaluation Mr. Coburn.")  (ECF No. 59, Exhibit 1, Page 25).  Second, he finds fault in the officers' decision to acquiesce to Mr. Coburn's request to be driven to his friend Korey's house.  ("The actions of Deputy Newsome and Sergeant Fox by removing Mr. Coburn from a safe location created the danger resulted in Mr. Coburn's death.")  (*Id.*, Page 26).  Thus, to borrow language from Defendants, the relevant legal question becomes whether, viewing the factual evidence and drawing all reasonable inferences in favor of the Plaintiff, every officer in Deputy Newsome and Sgt. Fox's shoes "would understand that assisting Michael in getting to his friend's house or not forcing Michael to receive unwanted medical attention would violate Michael's constitutional rights."  (ECF No. 66, Page 15).

In his first opinion, Mr. Noble points to a number of risk factors exhibited by Michael during his interaction with Dpt. Newsome.  These include:

"a history of drug abuse; where his mother, a nurse, said he [was] under the influence of methamphetamine; where they were told that he intended to commit suicide by overdosing on drugs; where Mr. Coburn admitted to Sergeant Fox he had overdosed two weeks prior; where Ms. Robinson said he wanted to leave the house to get drugs so he could overdose; where Mr. Coburn admitted he was a diabetic, he had not used his insulin for several days, and if he was going to die it would be due to his failure to administer his insulin; where any reasonable police officer would know that drug abuse and the lack of insulin would likely be a medical emergency; where Mr. Coburn's siblings he had a history of threatening suicide; where Mr. Coburn told Deputy Newsome he did not have any insulin; where Mr. Coburn claimed he could obtain insulin that was not prescribed to him by a doctor through a street source rather than a medical facility; and where EMS was standing by at a nearby location waiting for Deputy Newsome to approve their response to the scene."

(*Id.*).

---

[1] Defendants have moved to exclude Nobel's expert opinion.  Because his opinion does not prevent the issuance of summary judgment, the Court finds no jurisprudential value in deciding the issues raised in Defendants' motion

Given these facts, Mr. Noble argues that any reasonable officer would have called an emergency medical squad to evaluate Mr. Coburn. (ECF No. 59, Exhibit 1, Page 25).

As Defendants rightly point out, Mr. Coburn had a right to refuse medical care, unless he was an immediate danger to himself or others. This right is clearly established. *Ferreri v. City of Strongsville*, No. 1:10-CV-01014, 2011 U.S. Dist. LEXIS 3456, *28-29 (N.D. Ohio, Jan. 13, 2011). The right is also clearly expressed in the written policies Dpt. Newsome and Sgt. Fox are expected to adhere to. Morrow County Sheriff's Office Policy 433.5, which Plaintiff cites extensively, explicitly states that a person not in custody has the right to refuse medical care. "If a person who is not in custody refuses EMS care or refuses to be transported to a medical facility, a deputy shall not force that person to receive care or be transported." (ECF No. 43, Exhibit K, Page 2). Here, the undisputed facts show that Mr. Coburn did in fact refuse care. ("when Michael refused EMS care") (ECF No. 64, Page 43). (Michael "was adamant he wanted to leave.") (ECF No.47, Page 10). Additionally, as Defendants points out, the 6th Circuit has often cautioned officers against forcing unwanted medical care on unarrested individuals. *See Noble v. Schmitt*, 87 F.3d 157, 161-62 (6th Cir. 1996); *Planned Parenthood Southwest Ohio Region v. DeWine*, 696 F.3d 490, 506 (6th Cir. 2012); *Davis v. Hubbard*, 506 F. Supp. 915, 929-30 (N.D. Ohio 1980). People have a "clearly established right to not be seized for mental health reasons…unless the officers had probable cause to believe that the [person] was dangerous to himself or others." *Ferreri v. City of Strongsville*, No. 1:10-CV-01014, 2011 U.S. Dist. LEXIS 3456, *28-29 (N.D. Ohio, Jan. 13, 2011). Plaintiff's Response does not include any argument that the officers had sufficient probable cause to seize Michael. His Response focuses on language in the Policy authorizing deputies to "encourage" a person to engage with EMS. (ECF No. 64, Pages 11, 41, 43). Plaintiff's Response does not rely on R.C. 5122.01, a statute which

authorizes officers to seize a mentally ill person in certain circumstances. However, officers only have authority to do so under the statute if the person represents a danger to themselves or others. R.C. 5122.01(B). Plaintiff has not made that showing here.

Policy 433.5 allows an officer to overrule the objections of a person not in custody in only one specific instance. That being "where mental illness may be a factor," in which case, "the deputy should consider proceeding with a civil commitment in accordance with the Civil Commitments Policy." (*Id.*). Plaintiff's Response provided no evidence that the defendants knew Michael was suffering from any form of mental illness at the time of the interaction. Moreover, Plaintiff argues that Michael did not die as a result of a mental illness or drug induced suicide. (ECF No. 68, Exhibit 4, Page 6). "The plaintiff's legal theories in this memorandum are not based upon an alleged suicide." (ECF No. 64, Page 34).

Plaintiff also argues that the officers violated Morrow County Sheriff's Office Policy 434 because they "did not determine whether Michael relied on drugs, did not determine Michael's mental health, did not request needed EMT resources, and did not preserve Michael's safety." (ECF No. 64, Page 43). Policy 434 deals with "Crisis Intervention Incidents." (ECF No. 43, Exhibit L). Its purpose is to "provide[] guidelines for interacting with those who may be experiencing a mental health or emotional crisis." (*Id.*, Page 1). Defendants found no physical evidence of drug usage and could not otherwise find objective evidence that he was under the influence of drugs. With no evidence of potential suicide or drug usage, Plaintiff has not shown that the right to involuntary treatment is clearly established.

Mr. Noble's second issue with the officer's actions was their decision to acquiesce to Michael's demands to be taken away from Mr. Robinson's house. His report states that "[t]he

actions of Deputy Newsome and Sergeant Fox by removing Mr. Coburn from a safe location created the danger resulted in Mr. Coburn's death." (ECF No. 59, Exhibit 1, Page 26). By way of explanation, Mr. Noble states the following:

> The actions of Deputy Newsome and Sergeant Fox created or increased the risk that Mr. Coburn would be struck be a motor vehicle operated by a third person while Mr. Coburn was traversing a highway near Mr. Bowersmith's and Mr. Levings' house. Mr. Coburn was safer at Mr. Robinson's house before Deputy Newsome transported Mr. Coburn to Mr. Levings' house with Sergeant Fox's authorization. Deputy Newsome and Sergeant Fox could have saved Mr. Coburn from such harm by refusing to transport Mr. Coburn to Mr. Levings' house and having Mr. Coburn examined by the EMT squad or taken to the hospital instead.

(ECF No. 59, Exhibit 1, Page 26).

In Mr. Noble's opinion, the decision to drive Michael to Mr. Levings home was unreasonable. In this Court's view, no reasonable factfinder could find that the officers violated a clearly established right in giving Michael a ride to his requested location.

Plaintiff has provided no precedent to the effect that an officer may not give a coherent individual a ride to their requested location, no matter where it might be. This is particularly relevant in this case, given the uncontroverted facts that Michael was involved in a domestic incident with his mother, another resident of the home, and that Michael was dropped off at a friend's home, not the middle of the highway. (ECF No. 46, Pages 53). Michael had already expressed a desire to leave the residence before Sgt. Newsome arrived, and in fact had attempted to do so. ECF No. 46, Pages 37). There is no evidence that Sgt. Newsome and Sgt. Fox forced Michael to leave the residence, or that they chose the location at which to drop Michael off.

Plaintiff's assertion that Mr. Levings was a known drug distributer, which the Court takes as true at this time, does not change the analysis. (ECF No. 64, Page 37). It is undisputed that Mr. Levings was not subject to any warrants when Deputy Newsome dropped Michael off at his

house.  (ECF No. 43, Exhibit G, Page 4).  And even if he had criminal charges pending, there is no clearly established right to have officers refuse a request for a ride to a felon's home.

Plaintiff has not created a genuine issue of material fact that, by acquiescing to Michael's demands to waive off EMS and transport him to his requested location, Dpt. Newsome and Sgt. Fox violated a right so sufficiently clear that every reasonable official would understand what he or she is doing is unlawful.  As such, Dpt. Newsome and Sgt. Fox are entitled to Qualified Immunity.  Furthermore, even if Sgt. Fox and Dpt. Newsome were not entitled to qualified immunity, Defendants would still be entitled to summary judgment.

### c. State-Created Danger Claim

In general, the State's "failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."  *DeShaney v. Winnebao Cnty. Dep't. of Soc. Servs.*, 489 U.S. 189, 197, 109 S.Ct. 998, 1004 (1989).  However, this is not always the case.  Under the state-created danger exception "[s]tate officials may be found to have violated the substantive due process rights of people not within their custody 'when their affirmative actions directly increase the vulnerability of citizens to danger or otherwise place citizens in harm's way.'*" Cartwright v. City of Marine City*, 336 F.3d 487, 492 (6th Cir. 2003) (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 509 (6th Cir. 2002)).  To state a claim under this exception, Plaintiff must show:

"1) an affirmative act by the state [that] either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; 2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and 3) the state knew or should have known that its actions specifically endangered the plaintiff."

*Lipman v. Budish*, 974 F.3d 726, 744 (6th Cir. 2020) (quoting *Cartwright v. City of*

*Marine City*, 336 F.3d 487, 493 (6th Cir. 2003)).

Defendants contend that "Plaintiff cannot satisfy any of the elements." (ECF No. 51, Page 18). Plaintiff asserts that "Defendants Newsome and Fox are liable for causing a state-created danger." (ECF No. 64, Page 29). Plaintiff contends that he has shown that all three prongs have been satisfied. (ECF No. 64, Page 30-34). As detailed below, the Court finds that Plaintiff has failed to demonstrate a genuine issue of material fact on the first prong. Thus, the Court's analysis can end there. Defendants are entitled to summary judgment.

Defendants argue that "[c]onstitutional liability cannot be established against Deputy Newsome or Sgt. Fox because neither defendants' affirmative acts created or increased the risk that Michael would be struck by a private vehicle." (ECF No. 51, Page 18). Plaintiff points to two decisions that allegedly increased Michael's risk. ("Michael was less safe after Dep. Newsome *cancelled* the EMS call and *transported* him to Levings' home.") (ECF No. 64, Page 31) (emphasis added). Unfortunately for Plaintiff, no reasonable jury could find that these decisions increased the risk of danger to Michael.

As evidence for Plaintiff's first claim, he points to Michael and Lorrie's statements to Deputy Newsome that Michael "hadn't had his insulin for a few days, and it could kill him." (ECF No. 64, Page 31). He also makes reference to Michael's supposed methamphetamine intoxication (*Id.*). Given Michael's medical state, Plaintiff argues that Deputy Newsome's decision to cancel the Emergency Medical Squad dispatch increased the danger Michael faced. (*Id.*). The parties dispute whether cancelling the squad was an affirmative act as is required under the state-created danger test. Defendants argue that it was not, that it was a mere failure to act. (ECF No. 51, Page 18). Plaintiff frames this decision as an affirmative action. (ECF No.

64, Pages 31-32). For purposes of summary judgment, the Court will assume Plaintiff's view to be accurate.

Even assuming Plaintiff's version of the facts, no reasonable jury could find that Dpt. Newsome increased Michael's risk of death by vehicle. The uncontroverted record shows that Michael consistently and repeatedly stated that he did not need medical attention, and that he made this assertion before the Dpt. Newsome called off EMS. (ECF No. 46, Pages 40, 51). He even attempted to leave the residence on foot when he heard that his mother had called for help. (ECF No. 46, Page 37). As detailed above, Dpt. Newsome could not force Michael to undergo an examination by EMS, let alone hospitalize him against his will. Given Michael's intransigence, it is unclear how having EMS at the scene would have decreased his risk of death by private vehicle. Without Michael's consent, any EMS personnel on the scene would have been mere passive observers. And Michael vehemently refused to consent to medical attention. (ECF No.47, Page 10) (ECF No. 64, Page 43). Given these undisputed facts, no reasonable jury could find that Dpt. Newsome's decision to cancel the EMS dispatch increased Michael's risk.

As evidence for Plaintiff's second claim, he points to Mr. Levings' reputation as a drug dealer. (ECF No. 64, Page 32). By transporting Michael to a drug dealer's residence, Plaintiff argues, "Dep. Newsome and Sgt. Fox put Michael in a situation that increased the risk he would wander around, in an altered mental state, and stumble or walk into a nearby roadway." (*Id*.). Plaintiff cites two cases which he argues are analogous. (ECF No. 64, Page 33). *Davis v. Brady*, 143 F.3d 1021, 1024 (6th Cir. 1998) and *Family Serv. Ass'n ex rel. Coil v. Wells Twp.*, 783 F.3d 600, 606 (6th Cir. 2015).

Plaintiff's citation to *Davis* is misplaced. There, Plaintiff's complaint alleged that "after

20

taking Davis into custody, the defendant officers dropped Davis off on a dark, busy highway and left him there against his will." *Davis v. Brady*, 143 F.3d 1021, 1024 (6th Cir. 1998).  Here, on the other hand, the decedent was never in custody.  He specifically requested to be dropped off at Mr. Levings home and was dropped off at his requested location.  Not on the side of a dark, busy highway.  Given these facts, *Davis* is a poor guide.

Plaintiff's reference to *Wells Twp*. is similarly inapt.  There, the defendant officer "took Coil into custody" and then "left him facedown, pepper-sprayed and handcuffed, in the middle of a lane open to traffic."  *Family Serv. Ass'n ex rel. Coil v. Wells Twp.*, 783 F.3d 600, 606 (6th Cir. 2015).  While lying down, the Plaintiff was hit by a vehicle.  (*Id.*, 602). The court's analysis placed great emphasis on the fact that Plaintiff's injuries occurred while he was under arrest. Here, Michael was never arrested.  And his injuries occurred nearly 8 hours after his interaction with Dpt. Newsome ended.  As such, *Wells Twp*. is clearly not analogous to the present case.

Defendants, on the other hand, cite to more analogous cases, the most similar of which is *Williams v. City of Georgetown*.  There, officers pulled over Keith Burns after receiving reports of reckless driving.  *Williams v. City of Georgetown*, 774 F. App'x 951, 952-953 (6th Cir. 2019). Keith was "obviously frail and unsteady on his feet," "would not make eye contact" with the officers, couldn't explain what he was doing, was injured, gave inconsistent responses to police questioning, and had missed the last two doses of his diabetes medicine.  (*Id*., 953).  Even still, Burns "refused any treatment or transport to a medical facility."  (*Id*.)  After deciding "that Burns was not a danger to himself or to others" the officers impounded his truck."  (*Id*.).  They then drove Burns to a McDonalds by the interstate, where they left him to wait for his ride.  (*Id*.). Burns willingly accompanied the officers.  (Id., 956).  Burns, of his own volition, eventually left the safety of the restaurant.  (*Id*., 954).  He was stuck by a van on a roadway about 2 miles from

the McDonalds and killed.  (*Id.*).  The court granted summary judgment in favor of the defendant

officers.  *Williams v. City of Georgetown*, 774 F. App'x 951 (6th Cir. 2019).

The facts of *Williams* are comparable to the facts of the present case.  In both, police

transported an arguably unwell person.  (ECF No. 48, Page 17), (ECF No. 46, Pages 28, 35-36),

(ECF No. 63, Page 12).  Neither Burns nor Michael resisted the transport.  (ECF No. 63, Page

18).  And both were only injured after leaving the location at which they were left.  (ECF No.

50).  Additionally, the facts of this case are in some ways more favorable to the Defendants than

the facts of *Williams*.  Here, Michael specifically asked to be transported to Korey's residence.

(ECF No. 43, Page 82).  Further, Dpt. Newsome was aware of an arrangement between Michael

and his mother to deliver Michael insulin.  (ECF No. 43, Exhibit G, Page 5).  There was never

any custodial relationship between the officers and Michael.  And Michael was injured eight

hours after his last interaction with Dpt. Newsome.  Finally, there is no dispute that Michael had

already make attempts to go to Korey's home before the officers arrived.  (ECF No. 43, Page

82).  There is no indication that Michael would not have continued to do so had Dpt. Newsome

refused Michael's request for a ride.  The officers did not "further endangered the decedent."

*Williams v. City of Georgetown*, 774 F. App'x 951, 956 (6th Cir. 2019).

Plaintiff makes much of Korey's alleged drug dealing.  However, even assuming Dpt.

Newsome understood Korey to be in the drug trade, Plaintiff has failed to make the case that

Dpt. Newsome's transport of Michael to Korey's home increased his risk of death by private

vehicle.  "The question is not whether the victim was safer during the state action, but whether

he was safer before the state action than he was after it." *Cartwright*, 336 F.3d at 493. First,

Plaintiff has failed to produce any caselaw in which a state-created danger claim based on

officers' transport of an unarrested individual to their requested location, wherever it may be, has

22

survived summary judgment.

Second, Plaintiff has failed to produce any evidence that Michael would have broken from his stated plan of removing himself to Korey's residence had Dpt. Newsome not given him a ride.  As mentioned above, Michael was vocal about his desire to leave his residence to go to Korey's home.  (ECF No.47, Page 10).  He was going to Korey's "either on foot or car, the method of their transport home did not create or increase the risk of danger to" Michael.  *Devine v. Sevel*, No. 1:16 CV 2994, 2018 U.S. Dist. LEXIS 82753 (N.D. Ohio May 16, 2018).  In fact, Michael was unquestionably safer embarking on this journey with Dpt. Newsome than walking or getting a ride with a friend.  In a sense, Dpt. Newsome's favor to Michael actually decreased his likelihood of being hit by a private vehicle.

Finally, Plaintiff has failed to reckon with the domestic incident that occurred at Michael and Lorrie's residence.  While there is no indication that any party was violent, Michael and his family were clearly in conflict on the night of November 28th.  (ECF No. 46, Page 53) (ECF No. 43, Page 6).  Dpt. Newsome's action removed Michael from a domestic dispute and brought him to a place where Michael indicated he wanted to be.  By removing Michael from a scene of conflict, Dpt. Newsome likely increased his safety.  As such, no reasonable jury could find that Dpt. Newsome or Sgt. Fox's actions increased the risk that Michael would be struck by a private vehicle.

### d.  Monell Claim

Per this opinion and order, Plaintiff's claims against both individual defendants are dismissed.  Neither Sgt. Fox nor Dpt. Newsome violated Michael Coburn's constitutional rights.  As such, Plaintiff's accompanying Monell claim against Sheriff John L. Hinton is **DISMISSED**

as well. "The determination that the City's officials did not violate the plaintiffs' constitutional rights resolves the claim against the City as well." *Jones v. Reynolds*, 438 F.3d 685, 698 (6th Cir. 2006) quoting *Bukowski v. City of Akron*, 326 F.3d 702, 712-13 (6th Cir. 2003); *see also Smith v. Gallia Cty.*, No. 21-3620, 2022 U.S. App. LEXIS 1614 (6th Cir. Jan. 11, 2022).

### e. State Law Claim

As the federal claim in this case has been dismissed, the Court **DECLINES** to exercise supplemental jurisdiction over the remaining state law claim.  "[A] federal court that has dismissed a plaintiff's federal-law claims should not ordinarily reach the plaintiff's state-law claims." *Moon v. Harrison Piping Supply*, 465 F.3d 719, 728 (6th Cir. 2006).  "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726.

### f. Second Motion to Dismiss Voluntarily-- Partially and Without Prejudice

The parties have stipulated to the dismissal of Defendants Thomas E. Whiston, Burgess Castle, and Warren Davis.  Plaintiff's Motion to Dismiss Voluntarily concerns the same three defendants. As such, Plaintiff's Second Motion to Dismiss Voluntarily-- Partially and Without Prejudice is **MOOT**.  The motion is **DISMISSED**.

## E.  Conclusion

For the reasons stated above, the Court **GRANTS** Defendants' Motion for Summary Judgment.  (ECF No. 51).  Additionally, the Court **DISMISSES** Plaintiff's "Second MOTION to Dismiss Voluntarily--Partially and Without Prejudice" as **MOOT**.  (ECF No. 33).  The Court also **DISMISSES** Plaintiff's "AMENDED MOTION First MOTION for Leave to File Sur-Reply" as

**MOOT**.  (ECF No. 68).  Further, the Court **DECLINES** to exercise supplemental jurisdiction over the remaining state law claim.  This case is to remain open.

      **IT IS SO ORDERED.**


<u>**2/1/2023**</u>                         <u>**s/Edmund A. Sargus, Jr.**</u>
**DATE**                                 **EDMUND A. SARGUS, JR.**
                                            **UNITED STATES DISTRICT JUDGE**